# UNITED STATES DISTRICT COURT
for the
Middle District of North Carolina

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>Premises known and described as<br>6867 Wright Rd Lot 10 Thomasville, NC | Case No. 1:24MJ291-1 |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

Premises known and described as 6867 Wright Rd Lot 10 Thomasville, NC as further described in Attachment A.

located in the _____Middle_____ District of _____North Carolina_____, there is now concealed *(identify the person or describe the property to be seized)*:

Fruits, evidence, and instrumentalities of violations of 21 U.S.C. § 841(a)(1) as further described in Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 841(a)(1) | Possession with intent to distribute a controlled substance |

The application is based on these facts:
See attached affidavit incorporated by reference herein

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of _____ days *(give exact ending date if more than 30 days: _____ )* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

/s/ Alyson Halonen, ATF
*Applicant's signature*

Alyson Halonen, ATF
*Printed name and title*

On this day, the applicant appeared before me via reliable electronic means, that is by telephone, was placed under oath, and attested to the contents of this Application for a search warrant in accordance with the requirements of Fed. R. Crim. P. 4.1.

Date: August 5, 2024  8:21 am

*Judge's signature*

City and state: Durham North Carolina

Joe L. Webster, U.S. Magistrate Judge
*Printed name and title*

# AFFIDAVIT IN SUPPORT OF
# AN APPLICATION FOR A SEARCH WARRANT

I, Special Agent Alyson W. Halonen, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1. Currently, I am investigating the selling of firearms and drug distribution activities of Christian Jose FONSECA in the Middle District of North Carolina. As a result of this investigation, I have probable cause to believe that FONSECA did knowingly or intentionally, manufacture, distribute, dispense, or possess with the intent to manufacture, distribute, or dispense a controlled substance in violation of 21 U.S.C. § 841(a)(1). Further, as a result of this investigation, I have probable cause to believe that there are items and information, named and more fully described in Attachment B, that constitute evidence and fruits relating to violations of 21 U.S.C. § 841(a)(1) concealed within:

   A. A trailer located at 6867 Wright Rd Lot 10 Thomasville, NC (hereinafter **TARGET LOCATION**, more fully identified in Attachment A)

2. I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") and have been so employed since August of 2022. I am currently assigned to the Charlotte Field Division, Greensboro I Field Office. I am a graduate of the Federal Law Enforcement Training Center (FLETC) Criminal Investigator Training Program, as well as the ATF National Academy, where I received extensive training in the investigation of firearms, controlled substances, arson and explosives offenses. Prior to my career with ATF, I worked for the Wilmington Police Department in North Carolina for

approximately four years as a patrol officer. I am a graduate of the University of North Carolina at Wilmington as of 2014, with a Bachelor of Arts Degree in Criminology.

3. I am familiar with the ways in which narcotics traffickers conduct their business, including, but not limited to, their methods of acquiring and distributing narcotics, their use of telephones, and their use of code and slang words to conduct their transactions. I am familiar with practices used by traffickers involving the collection of proceeds of narcotics trafficking and methods of money laundering used to conceal the nature of the proceeds. I have conducted and assisted with numerous investigations regarding the unlawful possession, use, and distribution of narcotics during my law enforcement career. As a law enforcement officer, I have used and/or participated in a variety of methods investigating firearm and drug related crimes, including, but not limited to, electronic and visual surveillance, witness interviews, the use of search warrants, the use of confidential informants, the use of pen registers/trap and trace devices, mobile tracking devices, and the use of undercover agents. Based on my training, experience, and participation in this investigation and other investigations involving federal firearms and controlled substances violations, I know:

   a. That drug traffickers very often place assets, including accounts at financial institutions, in names other than their own to avoid detection of these assets by government or other law enforcement agencies;

   b. That even though these assets are in other persons' names, the drug dealers continue to use these assets and exercise dominion and control over them;

   c. That narcotics traffickers must maintain on hand large amounts of cash in order to maintain and finance their on-going narcotics business. Narcotics traffickers often carry, use, and traffic in firearms in order to protect their narcotics and money;

2

d. That illicit drug traffickers maintain books, records, receipts, notes, ledgers, computers and computer disks, airline tickets, money orders, cashier check receipts, automobile rental car records, photographs, and other papers relating to the transportation, ordering, sale, and distribution of controlled substances;

e. That illicit drug traffickers commonly "front" (provide on consignment) controlled substances to their customers; and that the aforementioned books, records, computers with hard drive and floppy discs, compact discs, receipts, notes, and ledgers are maintained where the illicit drug traffickers have ready access to them;

f. That persons who traffic in controlled substances are not unlike any other individual in our society in that they maintain documents and records. These documents and records will normally be retained for long periods of time regardless of whether their value to the individual has diminished. Often times, this type of evidence is generated, maintained, and subsequently forgotten. Hence, documents that one would normally think a prudent person would destroy because of the incriminating nature of the documents are kept. In fact, I have participated in the execution of search warrants where documentary evidence dating back years has been found. It is also my experience that the larger, more complex a continuing criminal enterprise is, the more documentary evidence is generated during the course of commission;

g. That it is common for large-scale dealers to secrete contraband, proceeds of drug sales, and records of drug transactions in secure locations within their residences, businesses, safe deposit boxes, and obscure locations known only to them, i.e. mail drops, mini storage warehouses, etc., for ready access and to conceal them from law enforcement authorities;

h. That persons involved in large-scale drug trafficking conceal in their residences, businesses, safe deposits boxes, obscure locations, and vehicles, caches of drugs, large amounts of currency, financial instruments, precious metals, jewelry, personal effects, coin collections, and other items of value representing the proceeds of drug transactions; and evidence of financial transactions relating to obtaining, transferring, secreting, or spending large sums of money made from engaging in illegal narcotic trafficking activities;

i. That drug dealers often purchase expensive vehicles and residences with the proceeds from their drug transactions;

j. That when drug dealers amass proceeds from the sale of drugs, they often attempt to legitimize these profits. I know that to accomplish this goal, drug

3

traffickers utilize including, but not limited to, foreign and domestic banks and their attendant services, securities, credit cards, cashier's checks, money orders, bank drafts, letters of credit, brokerage houses, trusts, partnerships, shell corporations, and business fronts;

k. That drug traffickers and persons engaged in firearms offenses commonly maintain addresses or telephone numbers in cellular telephones, books, or papers which reflect the names, addresses and/or telephone numbers for their associates in the organization;

l. That drug traffickers and persons engaged in firearms offenses take, or cause to be taken, photographs of themselves, their associates, their properties, their products, and their firearms, and these persons maintain these photographs and videotapes;

m. That in addition to methamphetamine, marijuana, cocaine, and other illegal and/or controlled substances, drug traffickers usually keep paraphernalia for manufacturing cutting, packaging, weighing, and distributing their drugs. This paraphernalia includes, but is not limited to, scales, plastic bags, rubber gloves, heat sealers, and vacuum sealers;

n. That the courts have recognized that unexplained wealth is probative evidence of crimes motivated by greed, in particular, illegal trafficking in controlled substances;

o. That the Net Worth and/or Source and Application of funds analysis can be used to show that a suspect's known expenditures and/or accumulation of assets substantially exceed his legitimate sources of income, which in turn may be used to prove that the suspect is engaged in illegal money generating activities, such as narcotics trafficking or fraud. The Net Worth analysis compares a suspect's net worth (cost value of total assets minus total liabilities) at a time just before the suspect has commenced his purported criminal enterprise, to his/her net worth at the approximate time of his/her arrest. The Source and Application of funds analysis focuses on the suspect's expenditures during the period of the purported illegal activities and compares such expenditures with his legitimate sources of income. Both analyses require evaluation of bank records, credit records, loan records, documents evidencing ownership of assets, and other documents evidencing the financial profile of the suspect during the course of the purported illegal activity, as well as a short time period prior to the illegal activity (one year);

p. That other than assisting in the net worth/source and application of funds analysis, a financial profile of a suspect prior to the purported criminal activity

evidences changes in lifestyle, asset accumulation, and expenditures between the time period prior to the illegal activity and the time period of the illegal activity that are consistent with a person generating income from illegal activities (e.g., narcotics trafficking or fraud), as compared to a person earning income from legitimate sources. Evidence of a defendant's expenditures, asset accumulation, financial lifestyle, net worth/source and application of funds analysis, and underlying financial documents necessary for such analysis are admissible evidence under federal case law in narcotic trafficking and money laundering cases. Thus, there is a need for such documents to be taken during the execution of a search warrant;

q. That the practice of receiving cash or other monetary instruments and holding this receipt to be a repayment of a prior loan and the wiring of money in nominee names through businesses such as Western Union or American Express MoneyGram, as opposed to utilizing the services available from mainstream financial institutions such as a bank, credit union, or savings and loan, are common tools utilized by narcotics traffickers;

r. That illegal possessors of firearms attempt to hide and conceal their true identity of the owner or possessor of the firearms. In attempting to do so, the prohibited person will sometimes use fictitious names when purchasing or sending firearms or use a relative, girlfriend or boyfriend, or associate to purchase, acquire, or send the firearm(s);

s. Most persons who own, possess, acquire, or maintain firearms, whether prohibited or not, keep and store firearms, ammunition, gun parts, gun-cleaning kits, holsters, ammunition belts, original box-packaging, targets, expended pieces of lead and bullet loading equipment either in their residence, storage building, or storage shed;

t. Firearms are seizable as indicia of drug dealing since possession of a firearm tends to demonstrate likelihood that the dealer took steps to prevent contraband, paraphernalia, and proceeds from being stolen.

4. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all my knowledge about this matter. On the basis of the entire contents of this affidavit, I believe there is probable cause for the issuance of search/seizure

5

warrants for the **TARGET LOCATION,** identified herein in Attachment A, for the purpose of searching and the seizure of physical evidence relating to the above-referenced offenses, including contraband, other vehicles, outbuildings and assets used in or derived from the on-going criminal enterprise described in this affidavit, and the instrumentalities for the commission of the offense referenced herein, *i.e.*, firearms, cellular telephone, telephone bills, toll records, telephone books (electronic and hand written), cellular phones, electronic storage devices, computers, photographs, correspondence, equipment and paraphernalia, for the dilution, weighing packaging, and otherwise engaging in the distribution of controlled substances and firearms possession.

## PROBABLE CAUSE

5. The United States, including The Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) is conducting a criminal investigation into Christian FONSECA regarding violations of 21 United States Code Sections 846 and 841 (possession with intent to distribute and to distribute a controlled substance and conspiracy to commit the same).

6. In the beginning of February 2024 an ATF Confidential Informant[1] (herein identified as CI) provided information to the ATF Greensboro Field Office in reference to an individual identified as Christian FONSECA. The CI indicated that FONSECA lived at the **TARGET LOCATION** and was a source of supply for methamphetamine and firearms in the area.

7. During the investigation, the ATF Greensboro Field Office has utilized the

---

[1] Confidential informant is paid and has a criminal history.

6

CI and an ATF Undercover Agent (herein identified as UC) to conduct multiple controlled purchases of methamphetamine and firearms from FONSECA. The first of these transactions occurred on February 13, 2024. On this occasion FONSECA instructed the CI and UC to meet at the **TARGET LOCATION** to conduct the transaction. FONSECA agreed to sell the CI and UC two ounces of methamphetamine for $600.00. The CI and UC were provided funds to complete the transactions and equipped with electronic surveillance equipment capable to recording audio and video.

8. Agents conducted physical and electronic surveillance throughout the duration of the transaction. Once the CI and UC arrived at the **TARGET LOCATION** they went inside the **TARGET LOCATION.** FONSECA indicated to the UC and CI that he was attempting to get the methamphetamine, however the individual he was getting it from was attempting to find a driver. FONSECA stated that he did not keep anything at his house and was working on a place to meet his methamphetamine source. While waiting FONSECA made numerous trips in and out of the **TARGET LOCATION** making phone calls. The CI, UC and FONSECA traveled to a Dollar General located at 1301 Trinity St, Thomasville, NC and there meet the source of supply for the methamphetamine and the transaction was completed.

9. The CI and UC returned to meet with agents and turned over a plastic bag containing a white crystal-like substance suspected to be methamphetamine. The substance was field tested which produced a positive result for methamphetamine. The packaged weight of the substance was determined to be 47.8 grams.

10. While inside the **TARGET LOCATION** FONSECA stated that he had a

7

pistol at the residence, then went to the kitchen and retrieved a firearm that was on top of the refrigerator. FONSECA pulled the magazine out of the firearm and handed the pistol to the UC. The UC note that the pistol was a Smith and Wesson, model SD9VE, 9 mm pistol. FONSECA laid the magazine on the coffee table in the living room. The UC noted that the magazine contained rounds of ammunition.



8




9

11. While conducting surveillance on FONSECA during the transaction, agents were able to obtain a North Carolina (NC) license plate number for the vehicle identified as a white Chevrolet Silverado truck that FONSECA was driving. Agents identified the NC license plate as KED-1896. Upon a law enforcement database query the vehicle is registered to FONSECA and comes back to the **TARGET LOCATION.**

12. After the first transaction was completed the UC was able to get FONSECA's phone number so further transactions could be conducted. FONSECA provided a phone number of 336-239-0085.

13. FONSECA kept communication with the UC and the second controlled purchase was conducted on April 19, 2024. On this occasion, FONSECA agreed to sell the UC two ounces of methamphetamine for $700.00. FONSECA again instructed the UC to meet him at the **TARGET LOCATION**. The UC was provided with currency and equipped with electronic surveillance equipment.

14. Upon arrival of the UC, the UC was invited inside the **TARGET LOCATION** by FONSECA's wife, Kristina Barbee. FONSECA then came down the hallway and told the UC that he was getting dressed. After dressing. FONSECA indicated that the UC was early and he had to call to get the methamphetamine on the way. While waiting, FONSECA made several trips in and out of the **TARGET LOCATION** making phone calls and engaging in general conversation with the UC. During this transaction, the UC observed a firearm sticking out of FONSECA's front right pocket.

 

15. A short time later, the UC observed an older model black Chevrolet Tahoe pull into the trailer park. FONSECA met with the driver of the vehicle. After, FONSECA came to the UC and handed him the suspected methamphetamine. After doing this, FONSECA pulled the pistol from his pocket, unloaded it and handed it to the UC. FONSECA agreed to sell the pistol for $600.00. The pistol was later found to be stolen when queried through law enforcement databases.



16. The UC returned to meet with agents and turned over a plastic bag containing a white crystal-like substance suspected to be methamphetamine. The substance was also field tested which produced a positive indication for the presence of methamphetamine. The packaged weight of the substance was determined to be 57.4 grams.

11

17. On April 22, 2024 FONSECA contacted the UC asking "wat u give for it ak 47 fully automatic" and attaches a picture of same. The UC advised the amount he would pay for it and FONSECA attempted to set up a transaction with the UC in reference to same. On April 24, 2024 FONSECA advised the UC that the AK-47 had been sold and was no longer available.

18. On May 8, 2024 FONSECA sent another picture of an AK-47 to the UC stating that it was available or sale. FONSECA asked the UC when he/she would be back in town to set up the transaction.

19. On June 28, 2024 Randolph County Sheriff's Office attempted to serve FONSECA with two North Carolina traffic warrants outstanding for his arrest. Deputies arrived at the **TARGET LOCATION** and knocked on the door. Upon doing so a male inside refused to open the door stating their name was "Joshua." After numerous attempts to get the occupants to open the door, FONSECA opened to the door and was identified by deputies.

20. FONSECA was transported to Asheboro Police Department to be interviewed by ATF Agents and to be served state warrants. Agents attempted to interview FONSECA who refused to acknowledge or sign a Miranda waiver and continued to ask what this was about. After numerous attempts agents were unsuccessful in interviewing FONSECA. Agents allowed FONSECA to have his telephone to obtain numbers he might need at the jail. Upon allowing FONSECA access to his phone, he began deleting text messages from same. Agents removed the phone from FONSECA's possession and a search warrant was obtained to search same.

12

## CONCLUSION

Based on the preceding information, there is probable cause to believe that the named items and information more fully described in Attachment B, constituting evidence or fruits of violations of 21 U.S.C. § 841(a)(1) will be found in the **TARGET LOCATION** more fully described in Attachment A.

/S/ ALYSON W. HALONEN
Alyson W. Halonen, Special Agent
Bureau of Alcohol, Tobacco, Firearms
and Explosives

Dated: August 5, 2024  8:21 am

Pursuant to Rule 4.1 of the Federal Rules of Criminal Procedure, the affiant appeared before me via reliable electronic means (telephone), was placed under oath, and attested to the contents of this written affidavit.

Honorable Joe L. Webster
United States Magistrate Judge
Middle District of North Carolina

## ATTACHMENT A

*Property to be searched*

The residence is located at 6867 Wright Rd Lot 10, Thomasville, North Carolina. The property to be searched is shown in photographs below:





14

# ATTACHMENT B

*Property to be seized*

1. Controlled substances;

2. Paraphernalia used in the manufacture, preparation, packaging, or weighing of illegal narcotics in preparation for distribution, to include, scales, plastic bags, gelatin capsules, vials, cutting agents (such as Mannitol and Quinine), and kilogram wrappers;

3. United States currency;

4. Records of narcotics transactions including books, ledgers, receipts, notes, pay and owe sheets, and other papers relating to the manufacture, transportation, possession, and distribution of controlled substances or the receipt and disposition of proceeds derived from the sale of illegal narcotics;

5. Financial and other records or documents reflecting narcotics-trafficking activity or the disposition of narcotics proceeds, including, but not limited to, financial instruments; stocks; bonds; jewelry; precious metals; bank checks; cashier's checks and receipts for such checks; Western Union receipts; money orders; money order receipts; credit cards; credit card records; pre-paid credit cards; green dot cards and documents relating thereto; vehicle registrations; real estate records; income tax returns and any documentation relating to the payment of any income tax; mail and contract mail carrier records; documentation and receipts relating to any safe deposit boxes and keys to safe deposit boxes; documentation and receipts relating to any storage facilities and keys to those storage facilities; devices capable of counting large sums of currency; other items of value or proceeds derived from the sale of illegal narcotics; and any other documents or evidence of financial transactions involving the receipt and disposition of the proceeds of illegal narcotics sales;

6. Records that identify other co-conspirators, including, but not limited to: address books; telephone books; rolodexes; telephone bills and records; telephones/cellphones and the numbers and other data stored within those telephones; pagers and personal digital assistants, and the numbers stored within those devices; devices capable of recording incoming telephone numbers, and the numbers stored within those devices; records of telephone calls, whether recorded electronically or in writing; notes reflecting telephone and pager numbers, or papers which reflect names, addresses, and telephone numbers of suspected co-conspirators; photographs (to include still photos,

15

negatives, movies, slides, video tapes, and undeveloped film); and audiotape recordings of conversations, including those made over telephone answering machines;

7. Documents or other records relating to state court proceedings involving other co-conspirators, including, but not limited to, charging documents and bail records;

8. Identification documents;

9. Records of travel including, but not limited to, tickets, transportation schedules, passports, automobile rental records, notes and receipts related to travel, and motel/hotel receipts;

10. Indicia of occupancy, residency, rental, control, and/or ownership of the premises/vehicle, including keys, photographs, deeds, mortgages, lease agreements, rental receipts, canceled checks, utility, cable, and telephone bills, titles, registration documents, and other documents;

11. Safes, combination or key-lock strong boxes or other secure storage containers, suitcases, file cabinets and other types of containers, whether locked or unlocked; hidden compartments that may contain any of the foregoing; and the contents thereof;

12. Any digital media including cell phones, digital cameras, computers, compact discs and flash drives that could contain videos, photographs, and communications, and the contents therein;

13. Firearms, ammunition, firearm parts, firearm receipts, firearms brochures or owner's manuals, records of sale or acquisition of firearms, firearms magazines, and holsters;

14. Computers or storage media used to commit the violations described above.

## ELECTRONICALLY STORED INFORMATION

The above-identified information and/or data may be stored in the form of magnetic or electronic coding on computer media, or on media capable of being read by a computer or with the aid of a computer related equipment. This media includes but is not limited to any magnetic or electronic storage device such as floppy diskettes, hard disks, backup tapes, CD-ROMs, optical discs, printer buffers, smart cards, memory calculators, electronic notebooks, cellular telephones, Smartphones (e.g., iPhone), or mobile media players (e.g.,

iPods). In searching for data capable of being read, stored, or interpreted by a computer, law enforcement personnel executing this search warrant will employ the following procedure:

    a.    Upon securing the premises, law enforcement personnel trained in searching and seizing computer data (the "computer personnel") will make an initial review of any computer equipment and storage devices to determine whether these items can be searched on-site in a reasonable amount of time and without jeopardizing the ability to preserve the data.

    b.    If the computer equipment and storage devices cannot be searched on-site in a reasonable amount of time and without jeopardizing the preservation of the data, then the computer personnel will determine whether it is practical to copy/image the data.

    c.    If the computer personnel determine it is not practical to perform an on-site searching, copying, or imaging (due to time, technical or other considerations), then the computer equipment and storage devices will be seized and transported to an appropriate law enforcement laboratory for review. The computer equipment and storage devices will be reviewed by appropriately trained personnel to extract and seize any data that falls within the list of items to be seized set forth herein.

    d.    Any data that is encrypted and unreadable will not be returned unless law enforcement personnel have determined that the data is not (1) an instrumentality of the offense, (2) a fruit of the criminal activity, (3) contraband, (4) otherwise unlawfully possessed, or (5) any data that falls within the list of items to be seized set forth within.

    e.    In searching the data, computer personnel may examine all data contained in the computer equipment and storage devices to view their precise contents and determine whether the data falls within the items to be seized as set forth herein.

    f.    If the computer personnel determine that the computer equipment and storage devices are no longer necessary to retrieve and preserve the data, and the items are not subject to seizure pursuant to Federal Rule of Criminal Procedure 41(b), the government will return these items within a reasonable period.

    g.    To search for data that is capable of being read or interpreted by a computer, law enforcement personnel will need to seize and search the following items, subject to the procedures set forth above:

- Any computer equipment and storage devices capable of being used to commit or store evidence of the offenses listed above;

- Any computer equipment used to facilitate the transmission, creation, display, encoding or storage of data, including but not limited to word processing equipment, modems, docking stations, monitors, printers, plotters, encryption devices, and optical scanners;
- Any magnetic, electric, or optical storage device capable of storing data such as floppy disks, hard disk tapes, CD-ROMs, CD-Rs, CD-RWs, DVDs, optical disks, printer or memory buffers, smart cards, PC cards, memory calculators, electronic dialers, electronic notebooks, USB flash memory devices, personal digital assistants, mobile telephones or answering machines;
- Any documentation, operating logs and reference manuals regarding the operation of the computer equipment, storage devices, or software;
- Any applications, utility programs, compliers, interpreters, and other software used to facilitate direct or indirect communication with the computer hardware, storage devices or data to be searched;
- Any physical keys, encryption devices and similar physical items that are necessary to gain access to the computer equipment, storage devices or data; and
- Any passwords, password files, test keys, encryption codes, or other information necessary to access the computer equipment, storage devices or data.

h. During the execution of this search warrant, law enforcement is permitted to: (1) depress the thumb – and/or fingers onto the fingerprint sensor of the digital device (only when the device has such a sensor), and direct which specific finger(s) and/or thumb(s) shall be depressed; and (2) hold the device in front of the targets face with his or her eyes open to activate the facial-, iris-, or retina-recognition feature, in order to gain access to the contents of any such device. In depressing a person's thumb or finger onto a device and in holding a device in front of a person's face, law enforcement may not use excessive force, as defined in *Graham v. Connor*, 490 U.S. 386 (1989); specifically, law enforcement may use no more than objectively reasonable force considering the facts and circumstances confronting them.